(No. 15711.—Reversed and remanded.)
MARY CHANCE, Appellee, *vs.* JOHN J. KINSELLA, Appellant.

*Opinion filed December 19, 1923—Rehearing denied Feb. 8, 1924.*

1. DEEDS—*old age and feeble health of grantor are not, alone, sufficient to set aside deed for mental incapacity.* Old age and feeble health do not constitute unsoundness of mind even when accompanied by defective memory and mental sluggishness, and a deed will not be set aside for mental incapacity where the evidence shows merely that the grantor was old and childish, with weakened physical and mental powers, and does not show that she did not understand what property she had or the effect of her deed.

2. SAME—*mere fact of relationship of parent and child does not create presumption of undue influence in execution of deed.* The mere fact of relationship is not sufficient to create a presumption that a deed from the parent to the child was procured by fraud or undue influence, and where there is no evidence of any actual undue influence exerted to procure the execution of the deed nor any evidence showing the existence of a fiduciary relation, the deed will not be set aside on that ground although it conveys all the property owned by the grantor.

3. EVIDENCE—*when testimony of defendant, called by complainant as witness, must be taken as true.* Where the complainant in a suit to set aside a deed for undue influence calls the defendant to testify as her witness she is not bound by his testimony but may introduce evidence to contradict it, but she cannot call in question the defendant's credibility, and if his testimony is not contradicted it must be taken as true.

APPEAL from the Circuit Court of Peoria county; the Hon. JOHN M. NIEHAUS, Judge, presiding.

MCGRATH, STONE, DAILY & MICHEL, for appellant.

CAMERON & ANDERSON, (GEORGE W. HUNT, of counsel,) for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

Mary Chance filed a bill in the circuit court of Peoria county to set aside a deed executed by Hannah Kinsella on May 21, 1920, to John J. Kinsella, for a city lot in Peoria.

There was a decree for the complainant, from which the defendant appealed.

Hannah Kinsella was the mother of the appellant and the appellee and the city lot conveyed is all the property she owned. On it were two small houses in a bad state of repair, one of which she rented for $13 a month, the other for $8 a month, except one room in which she lived. The property was worth about $1200. She could neither read nor write, and the evidence indicates that her age, which was not certainly known, was at least eighty years, as the master found. She died on June 10, 1920, leaving as her only heirs the appellant and the appellee and another daughter who lived in Tazewell county. The appellee lived almost a mile and the appellant six or seven blocks from their mother, who visited or was visited by the appellee almost every day. The appellant in September, 1912, had filed a petition in the county court for the appointment of a conservator for his mother on the ground that because of her excessive use of intoxicating liquors she had become a spendthrift. A short time before she had received $1300 insurance on account of the death of another son. No conservator was appointed but for a time Mrs. Kinsella was very resentful toward the appellant. A few days before making the deed, on April 26, 1920, Mrs. Kinsella executed her will, by which she gave legacies of five dollars each to the appellant and her other daughter and devised all her real estate to the appellee for life with remainder to the heirs of her body, and bequeathed all the residue of her property to the appellee. The bill of complaint alleges that on May 21, 1920, Mrs. Kinsella was an invalid, in poor health, infirm physically and mentally, about eighty-four years of age, uneducated, unable to read or write, and by reason of her physical and mental condition incapable of transacting her ordinary business affairs and mentally incapable of making the deed; that the appellant, for the purpose of defrauding Mary Chance out of her rights in

the premises, through trick, artifice and undue influence then practiced upon Mrs. Kinsella, induced her to execute the deed, representing to her that in consideration of his kindness and attention to her shown during her lifetime, he, alone, was entitled to her bounty to the exclusion of his sisters, and that she was under legal and moral obligation to convey the lot to him in consideration of his kindness and attention to her.

The evidence shows that Mrs. Kinsella was an active woman, who frequently called upon and visited her neighbors, rented her own property without assistance, collecting the rent and giving receipts therefor which had been signed in her name by the appellee, and after collecting the rents sometimes forgot that she had done so and claimed that the rent had not been paid. In such cases the matter was usually adjusted by the appellee. Mrs. Kinsella could not count her money and would give the bills which she owed to the appellee, who would take what money was needed from her mother and pay them. Mrs. Kinsella frequently became confused as to the day of the week, and several instances were testified to of her preparing meat to eat on Friday though she was a Catholic, thinking the day was Thursday or Saturday. She would not eat the meat when her attention was called to her mistake. Sometimes she overstocked her pantry with perishable food and would forget that she had anything to eat. She would forget where she had left her keys and pocket-book and would think that she had lost them though she had merely left them in the house on coming out. Sometimes when she had been visiting until after dark she would become confused as to the way home, passing her house without going in. Sometimes in going to a neighbor's she would pass the house. She would begin talking about one thing and abruptly change to another apparently without any connection. She sometimes imagined events had occurred which had no existence. Once she said she had some geese and someone killed them

and put the feathers in the house, though she had no poultry at the time. Mary Bimmerle, whose mother had been dead for five years, testified that Mrs. Kinsella, though she knew of her mother's death, would ask how her mother was, and on being told that she was dead would say she forgot. Mary Huerter, whom Mrs. Kinsella frequently visited and who usually called for her on the way to the church, testified that Mrs. Kinsella did not do anything crazy or irrational but was childish.

There was testimony to acts of forgetfulness or absence of mind by a number of witnesses, some of whom expressed the opinion that Mrs. Kinsella was not right in her mind. Other witnesses who had an equal opportunity of observation testified that they saw no sign of mental unsoundness. There was no evidence of any irrational act. Her life was quiet and uneventful, and there was nothing in her actions to occasion remark or notice except her forgetfulness, her confusion at times about localities and getting lost, her losing her keys or other articles, what some of the witnesses regarded as her disconnected conversations, and her failure at times to recognize people. There is no evidence that she did not know her relatives and friends and what property she had. She was ignorant but not unintelligent. Because she could not read, write or count she was dependent in the payment of her bills on the honesty of those with whom she dealt and the assistance of others. The master found that Mrs. Kinsella was at the time of her death at least eighty years of age, that she was wholly illiterate, unable to read or write or to correctly count or compute amounts of money or attend to business of any character in a safe or business-like manner, and that she was, as charged in the bill of complaint, at the time of the execution of the deed in her dotage, and by reason of her age, forgetfulness and lack of knowledge of business affairs was wholly unable to reasonably comprehend and appreciate the character of the deed or the steps necessary to protect her

rights and interests in the property; that the appellant had filed a petition for the appointment of a conservator and that she was greatly incensed against him therefor for several years, but that a short time prior to the execution of the deed she had become reconciled to him and he had made some gifts of money to her and assisted her in obtaining the necessaries of life.

The appellant was called as a witness by the appellee and testified as to the circumstances under which the deed was made, and the master made these findings: "That it further appears from the evidence of said John J. Kinsella that about a week prior to the time of the execution of said deed he visited his said mother at her residence aforesaid and there learned from her that she had executed her said last will and testament and of the contents thereof and that she was dissatisfied with the terms and provisions of said will, and that thereupon, after talking the matter over with her, his said mother asked him if he would take care of her and pay her bills if she deeded said property to him, and that he said he would, and that thereupon his said mother requested him to have a deed prepared for said premises, and that pursuant to her instructions in the matter he did procure Nathan Weiss, an attorney at this bar, to come to his, the defendant's, dwelling house and meet his mother there on the date said deed was executed; that he, the defendant, was not present at the time said deed was executed, but that said Weiss on said occasion interviewed his mother there, at the defendant's dwelling house, alone, and there prepared said deed and procured the execution thereof by her, and that the said deed, after being so executed, was delivered to him, the defendant, who thereupon caused the same to be recorded by the said Weiss as his agent. Said defendant further distinctly testifies that the consideration for said deed was that he, the defendant, should thereafter take care of his said mother and look after her for the rest of her life, and that pursuant to said agree-

ment he did thereafter permit her to use and occupy said premises in the same manner that she had used and occupied the same prior to the execution of said deed, and that after her death he paid all bills left by her and all expenses of her last illness, the amount of which said bills and expenses so paid by him does not appear from the evidence."

These findings are in accordance with the evidence, except that the master's report of the evidence shows that the appellant did not testify that he learned from his mother of the making of her will or that she was dissatisfied with the will, but only that his mother told him she had made a mistake which she wished to correct. His testimony was uncontradicted. The master concluded that a confidential relation existed between the appellant and his mother which cast upon him the burden of showing that the transaction was fair, equitable and reasonable, and that Mrs. Kinsella at the time of making the deed was competent to understand, and did understand, the nature, character and effect of the transaction. This burden the master found that the appellant had failed to sustain by a preponderance of the evidence, and therefore he recommended a decree setting aside the deed. It is upon this last finding that the recommendation of the master and the decree of the chancellor are based and not on the mental incapacity of Mrs. Kinsella.

The deed and the will were prepared by different lawyers and the interval between them was twenty-five days. Joseph F. Bartley, who drew the will, had known Mrs. Kinsella all his life, having been born and lived in childhood in the neighborhood in which she lived. He testified: "I was called to her home about ten o'clock and found her in bed in the rear room of her home, on McBean street. There were several people in the room. I think Mary Chance was there, some next door neighbor, and some other woman I didn't know. Mrs. Kinsella said she wanted to make her will. Mrs. Chance and the other women left the room at my request. I then talked to her about her will and what

she wanted to do by it. She said she'd had a fall that morning early, had injured herself and wanted to fix up her affairs. I asked her what property she had, and she said the little house where she was then living and the house next door, both on one lot. She told me she had three children, which I knew. I knew John Kinsella and was friendly with him. When she told me she wanted to make her will leaving everything to Mary Chance, I asked her if there was any trouble between herself and John, because if there was I didn't wish to have anything to do with the transaction. She told me there was no trouble; that John had done reasonably well and that Mary Chance had married a worthless husband, and she wanted Mary Chance's children taken care of and to receive a Catholic education. I asked her where she kept her papers, and she told me. She said these papers were kept in a tin box and asked me to get them. I got them and we went over them; got the deeds, tax receipts, and she explained to me all about her property. During the conversation she talked about my mother and our family,—a general conversation,—and reverting to John I asked her again if any unfriendly feeling existed between her and John and she said no; that she was sure John would be satisfied; what she had did not amount to anything and she wanted to give it that way. I have an opinion with reference to her mental soundness on that date, and in my opinion she was of sound mind and able and competent to transact ordinary business. She seemed no different from the lady I had known in previous years. I had no question, otherwise I would not have made her will."

Nathan Weiss, who prepared the deed twenty-five days later, testified that he "was acquainted with Hannah Kinsella. First became acquainted with her through proceedings in probate court seven to ten years ago with reference to appointment of conservator. I met her on several occasions after that. I was present at the home of Hannah Kinsella on the day that the deed which forms the basis of

this suit was executed. I prepared the deed. John Kin-sella phoned me shortly before, asking whether I could come to his home; that his mother wanted some papers drawn. That was a day or two, possibly three or four days, previous to its execution. I went to his house as per ap-pointment, met Mr. Kinsella, who was in the yard, went in and found the old lady in the home. I was there possibly half or three-quarters of an hour,—maybe an hour. I told her I had received this call; wanted to know if she wanted some papers made out. She said she did; that she wanted to make a deed of the property in question to her son, John. I talked the thing over and asked if that was what she wanted to do and if she understood the transaction, and asked her why she wanted to do it. She said John had al-ways taken care of her and helped her when she needed anything and had been good to her, and she wanted to make the deed to him. So the deed was prepared and she signed it by mark. I witnessed the mark and took the acknowledg-ment as notary. She told me to give the deed to Mr. Kin-sella. I did as I went out and he asked me to have it re-corded, and I did. During the time I had the conversation with her and prepared the deed in question I was alone with her. There was nobody else present in the house. I talked to her generally. I had in mind the previous trouble in the family and took pains to converse with her and get a line on the situation generally. I found her quite alert, keen, sharp-witted old lady. She had been in past times addicted to the use of intoxicating liquor. That formed the basis of the petition in the probate court. At the time she executed the deed in question she was absolutely sober and her mental condition was very good. I formed an opinion from my conversations with her during the time I knew her and including the one on the date the deed was made, and my observations of her during my acquaintance with ref-erence to her mental condition. She was unquestionably of sound mind."

Dr. Trewyn, Mrs. Kinsella's family physician for five years, who attended her on various occasions, treated her approximately six months before her death, and testified that he talked with her and observed her general condition, and that she was then of sound mind and capable of transacting ordinary business.

The evidence does not justify a finding that Mrs. Kinsella was not of sound mind. It shows only that she was old and childish, with weakened physical and mental powers, but not that she did not understand what property she had or the effect of the deed or the will which she executed. Old age and feeble health do not constitute unsoundness of mind even when accompanied by defective memory and mental sluggishness.

There is no evidence in the record of any actual undue influence exerted to procure the execution of the deed. The decree is based upon undue influence presumed to have been exercised by reason of the confidential relation between the mother and her son which imposed upon him the burden of rebutting the inference of undue influence arising from the relation. The only evidence in regard to the circumstances under which the deed was executed is derived from the testimony of the appellant and the attorney who drew the deed. The appellee called the appellant as her own witness. She was not for that reason bound by his testimony but might show the truth by any competent evidence, even in direct contradiction of what the appellant testified, but she could not call in question the appellant's credibility. The part of his testimony which is in his favor must be considered, and if there is no countervailing testimony it must be taken as true. (*Luthy & Co.* v. *Paradis,* 299 Ill. 380.) There is no evidence contradicting the testimony of the appellant that he did not know that his mother had made a will; that she told him she had made a mistake but did not tell him what it was; that the consideration of the deed was his agreement to take care of his mother and.

pay her bills; that the idea of making the deed originated with her; that he never collected any rent from the tenants in his mother's lifetime; that he telephoned for the lawyer to go to his mother's house, but that she did not want him to come there and for that reason the appellant telephoned him to come to the appellant's house. There is no evidence that the appellant ever transacted any business for his mother in her lifetime or that she ever asked or he ever gave her any advice, that he ever sought to influence her in any way to make the deed or that any fiduciary relation existed between them. There is no presumption from the mere fact of relationship that a conveyance from a parent to a child is the product of fraud or undue influence. *Hudson* v. *Hudson,* 237 Ill. 9; *Smith* v. *Kopitzki,* 254 id. 498.

The decree of the circuit court will be reversed and the cause remanded, with directions to dismiss the bill.

*Reversed and remanded, with directions.*