Anthony Kovell, by his Next Friend and Father, Anthony Kovell, Sr., Appellee, v. North Roseland Motor Sales Inc., et al., Defendants. Frank Kucinskis et al., Appellants.

Gen. No. 37,131.

Opinion filed June 15, 1934.

J. P. WAITCHES, for appellants; DAVID G. STONE, of counsel.

EARL J. WALKER, for appellee.

MR. JUSTICE SCANLAN delivered the opinion of the court.

Plaintiff sued North Roseland Motor Sales Inc., Frank Kucinskis, Sr., Joseph Kingma and Frank Kucinskis, Jr., in case. Kingma was not served and the suit was dismissed as to him. A jury returned a verdict finding defendants Frank Kucinskis, Sr., and Frank Kucinskis, Jr., guilty and assessing plaintiff's damages in the sum of $4,200. There was a directed verdict in favor of North Roseland Motor Sales Inc. The Kucinskises, hereinafter also called senior defendant and junior defendant, have appealed from a judgment entered upon the verdict.

No point is raised on the pleadings. Plaintiff sued to recover damages for injuries sustained as the result of his having been struck by an automobile driven by

junior defendant. The accident happened in the street in front of plaintiff's home, 10610 Edbrooke avenue. That avenue is a residence street, upon which boys living in the neighborhood are accustomed to play various games. At the time of the accident 15 to 20 boys "were playing touch tackle, just passing the ball around." The evidence for plaintiff showed that just before and at the time the automobile struck him it was travelling at a very fast rate and that after the collision the car dragged him along the street for a distance of between 20 and 30 feet, that then the brakes were applied and he was thrown upward about five feet and away from the car. As defendants have not here argued that the jury were not warranted in finding junior defendant guilty, it is unnecessary for us to discuss further the evidence bearing upon the accident. The accident occurred on October 30, 1931. Junior defendant was then 16 years of age, and defendants' evidence shows that he had been allowed, by his parents, to drive an automobile for three and a half years prior to the accident.

Appellants contend that the evidence did not sustain the verdict and that the trial court erred in refusing to direct a verdict for senior defendant.

North Roseland Motor Sales Inc. was engaged in the sale and service of automobiles and maintained a garage and salesroom at 10558-60 South Michigan avenue, Chicago. It is a reasonable conclusion from the evidence that the business was, in fact, owned by senior defendant. From his testimony we learn that he was its president and manager and that he had charge of the sales, the collections, "and everything." To use his own language: "I was the whole cheese"; "I am the whole cheese." The following excerpts are taken from his direct testimony: "Q. And you are in the automobile business? A. Yes, sir. Q. What is the name of your company? A. The

North Roseland Motor Sales, Incorporated. Q. Located at what street address? A. 10558-60 South Michigan Avenue. Q. You have been in business ever since what time? A. Since 1910.'' For three years prior to the accident, junior defendant had been working in the garage daily from three o'clock p. m. until six o'clock p. m. His duties, according to senior defendant, were to repair tires, dust off automobiles *and assist the mechanics*. The corporation owned and maintained an Oldsmobile DeLuxe sedan which senior defendant stated was used as a demonstrator in the business of the corporation. The son was driving this car at the time of the accident. The father testified that he, as manager of the corporation, and for corporate purposes solely, had the exclusive use of this car, but he later admitted that the mechanics sometimes used it. Junior defendant testified that his father sometimes used the car for personal matters. Plaintiff's evidence tended to show that junior defendant had been in the habit of using it. The latter testified that the father had forbidden him to use the Oldsmobile DeLuxe sedan and that he had never used it until the day of the accident; that he had been in the habit of using his sister's car and also his brother's car. His mother testified that he had a car of his own, which was kept at the garage. The father testified that he had forbidden his son to use the Oldsmobile DeLuxe sedan and that he did not know that the latter was using that automobile on the day of the accident. Paul Kovell, plaintiff's brother, testified that after the accident Anthony Kovell was taken to the Roseland Community hospital and that senior defendant and junior defendant came there and senior defendant had a talk with plaintiff's father. The trial court then put to the witness the following question: ''The Court: No, — what did he (referring to senior defendant) say? Be specific. Let us have the exact

language as near as you can recall it. A. Well, he said he don't see how the boy can have an accident, he said he sent his son to get his aunt or some member of his family. — I don't know which now, and the brakes is demonstrated good, and he asks does he blow the horn, and that is about it.'' The witness further stated that he and his father went home in an auto with the two Kucinskises and that during the ride there was a conversation between the latter. The witness was then asked to state what senior defendant said, to which question the witness made the following answer: ''Mr. Frank Kucinskis, Senior, he say that he don't see how, he don't know, — he don't understand how there can be an accident, — how the boy can get in an accident; he demonstrated the brakes, — they were in perfect order, and he question him whether he blew his horn, and his son said he did.'' The witness stated that he had detailed, in substance, all that was said by senior defendant that evening. *There was no cross-examination of this witness.* Senior defendant and junior defendant admitted being at the hospital on the occasion in question and that they left it with the Kovells, and that the ''father had considerable talk about how the accident happened and with reference to the brakes of the car.'' Senior defendant testified that he had a conversation with the father of Anthony Kovell at the hospital but that he did not make the statement that he ''had sent Frank Kucinskis, Jr., for an aunt or for his mother.'' Junior defendant testified that he did not *hear* his father say to Mr. Kovell that he had sent the witness for his mother or aunt. The witness was asked the following questions: ''Q. There was some talk at the hospital between Mr. Kovell and Paul? A. Yes, sir. . . . Q. Then you and your father had considerable talk about how the accident happened? A. Yes, sir. Q. And you and your father had considerable conversation on the way home with reference to the brakes of the

car and whether you could stop the car or not? A. Yes, sir. Q. He asked you quite a bit regarding that on the way home? A. Yes, sir.'' It is significant, as plaintiff argues, that while the Kucinskises admitted that there was considerable conversation as to the manner of the accident and the condition of the automobile, that neither the father nor the son testified that the former made any statement to the effect that the son was using the automobile on the occasion in question without the authority or knowledge of the father.

Defendants contend that ''the plaintiff called the senior defendant as a witness in his own behalf. He then testified in behalf of the plaintiff, that he had no knowledge prior to the accident of the car having been taken out and used by the junior defendant; that it had been taken out without his knowledge. The plaintiff was and is bound by this evidence.'' The exact testimony upon which defendants rely is as follows: ''Q. This particular car involved here prior to this time or on this particular day, did your son drive it during this particular day? A. Well, I didn't know that. See? Q. You don't understand me. I mean, during the day the Kovell boy was hurt, did your boy drive *your* car at that time? A. No, sir, not that I knew about.'' Defendants argue that as plaintiff called the senior defendant he is bound by this evidence. The direct question was, ''Did your boy drive *your car* at that time,'' and, as senior defendant contended, in the trial, that the corporation, and not he, owned the car involved, his answer would hardly have the probative effect claimed by defendants. But assuming that it did, plaintiff was not bound by the evidence. In *Highley v. American Exch. Nat. Bank,* 185 Ill. 565, 570, the court held:

''A party is not conclusively bound by the statements made by a witness whom he has called to give testimony. He may call another witness to disprove

such statements. (*Rindskoph & Co. v. Kuder*, 145 Ill. 607.) The general rule a party may not impeach the character of a witness he has voluntarily introduced is not infringed by the introduction of other testimony disproving the statements of such witness as to facts and circumstances involved in the hearing.'' In *Chicago City Ry. Co. v. Gregory*, 221 Ill. 591, 597-8, the court held:

''The law is well settled that a party to a suit cannot impeach a witness voluntarily called by him, except as that result may be incidentally accomplished by proving a state of facts differing from that sworn to by the witness in question. Greenleaf on Evidence, sec. 442; *Rockwood v. Poundstone*, 38 Ill. 199; *Griffin v. City of Chicago*, 57 id. 317; *American Hoist and Derrick Co. v. Hall*, 208 id. 597; 10 Ency. of Pl. & Pr. 316.''

In *Chance v. Kinsella*, 310 Ill. 515, 523, the court stated:

''The appellee called the appellant as her own witness. She was not for that reason bound by his testimony but might show the truth by any competent evidence, even in direct contradiction of what the appellant testified, but she could not call in question the appellant's credibility.''

In connection with the instant contention defendants argue that because of the injurious effect upon plaintiff's case of this testimony of senior defendant, plaintiff, in a desperate effort to counteract the effect of that testimony, caused Paul Kovell to testify to the conversation between senior defendant and plaintiff's father at the hospital after the accident. In making this argument counsel for defendants forget that Paul Kovell testified to the said conversations before senior defendant was called as a witness in the case.

Defendants contend that the evidence shows that the automobile involved in the accident was owned by

the defendant corporation and that it was used exclusively in its business, and they argue that these alleged facts are of controlling influence in the determination of the case. We think the jury would have been warranted, under the evidence, in finding that the corporation was merely a cloak under which senior defendant operated his business and that he, in fact, owned the automobile. However, if it be assumed that the corporation owned the automobile, that fact would not relieve senior defendant from responsibility if the jury adopted plaintiff's theory of fact. In *Stegman v. Sturtevant & Haley Beef & Supply Co.,* 243 Mass. 269, 273-4, it was said:

"When the collision occurred Dole was carrying out the order of Perkins as an individual, and was not operating the motor car in the performance of his duties as an agent of the corporation. If Dole were in the general employment of the corporation and the automobile were owned by Perkins, who requested him to take it to Cambridge and bring Scannell to Perkins' house for the accommodation of Perkins, the jury could find that at this time, and while so engaged, Dole was the servant of Perkins. In *Chute v. Morey,* 234 Mass. 387, the driver of the car was in the employ of the Vulcan Garage Company. The defendant was the president of the company. He brought his car to the garage and told the driver 'to fix it,' to 'take it out and try it.' The accident happened while the driver was operating the car for the purpose of trying it out. It was held that the finding for the plaintiff was justified on the ground that the driver became temporarily the servant of the defendant. See *Higgins v. Bickford,* 227 Mass. 52. Although, in the present actions, the automobile was not owned by Perkins, the jury could find on the evidence that he was not authorized to use it in his private business or to instruct Dole to perform such work as he was then en-

gaged in. If Perkins directed the operator to use it for such purpose, they could find that he assumed control and ownership of the automobile during the progress of the business, and stood, for the time being, as the owner to the same extent as if he himself had taken the car from the garage for his personal business. They could find that, by appropriating the automobile, without right, for the purpose of carrying Scannell to Melrose, he had converted it to his own use. If these facts were found, he would be liable to the same extent as if he owned the car. The jury could also find that Dole consented to become the servant of Perkins temporarily, in the performance of the particular business, and that Dole was his servant at the time in question.''

''The borrower of a motor vehicle is liable for the negligence of one who at the time of the injury is driving the car as his agent or servant.'' (42 C. J. 1125, sec. 891.)

''A borrower is liable for the negligence of his chauffeur in the operation of the borrowed car, although he is not riding in it.'' (Berry Automobiles (6th ed.) Vol. 2, p. 1205, sec. 1445.)

As bearing upon the instant contention that the corporation owned the car, it is not without significance that junior defendant, a mere boy, in his testimony was always careful to call the automobile he used ''the *corporation* car.''

Defendants contend that ''the plaintiff has utterly failed to prove . . . that the driver of the car was his (senior defendant's) servant and was driving it in his business and by his authority, and, therefore, the judgment of the trial court against the senior defendant must be reversed without remanding.'' We have studied with great care the evidence that bears upon the question as to whether or not the senior defendant sent his son to get his mother and we are satisfied

that we would not be justified in holding that the finding of the jury that he did so was against the manifest weight of the evidence. The evidence of Paul Kovell, if believed by the jury, would be practically conclusive upon the subject. We find a number of circumstances that tend to support plaintiff's theory of fact in that regard. To refer to a few: It is conceded that junior defendant went to his brother's home with the automobile for the purpose of taking his mother home. The senior defendant had allowed junior defendant to drive automobiles from the time the latter was 12½ or 13 years of age and it might well seem strange to the jury that the junior defendant was permitted to use other cars in the garage but not the particular one involved in the accident. The senior defendant admitted that the mechanics used that car at times and that part of the duties of junior defendant was to assist the mechanics. While senior defendant denied that the son had ever used the demonstrating car before the day in question, plaintiff introduced evidence to the effect that junior defendant had for a long time past used an Oldsmobile car with a dealer's license on it. The theory of defendants is that junior defendant "sneaked" the auto out of the garage, but the latter testified that when he left the garage he drove through the front entrance of the garage, where his father was attending to business, although he might have used the back entrance. He was certain, however, that when he took *"the corporation car"* out of the garage his father did not see him. After the father had been informed about the accident and how it occurred, he said nothing, in the conversations heretofore referred to, that would indicate that the automobile had been taken by junior defendant without his knowledge or consent. His sole concern at the time of the conversations was the condition of the machine and the manner of the accident. From many circumstances the jury

might well believe that the instant defense was an afterthought. In Huddy Encyclopedia of Automobile Law (9th ed.) 7-8, the author states (p. 337):

"But owing to the intimate relations between members of a family, less evidence may be required to show the agency of the driver than is required in cases of paid employees." (See also *Kolensky v. DeFrancesco*, 102 Conn. 660, 662.)

Defendants contend that "even if the junior defendant had been sent by the senior defendant to call for and bring his mother home, . . . the relation of master and servant would have ceased as soon as he, junior defendant, disobeyed his mother's instructions to wait for her and went on a pleasure ride of his own." The argument in support of the instant contention is based upon the testimony of junior defendant, called as a witness "in his own behalf." He testified as follows in relation to the alleged deviation: "Q. Where did you go with this car? A. With the *corporation's* car that evening? Q. Yes. A. I drove over to my brother's house. Q. Where did he live at that time? A. 9917 Yale. And I drove over there and parked, that is all, and after a while my mother came out and I asked her if she wanted to go home and she said, 'No, I will stay in the house,' wait for me out here, and she goes back in and I think I will listen to the radio in the car a while, and while I was waiting there I decided to go for a ride. Q. Where did you go? A. I went down 99th street, down to State and south to 107th, and at 107th I turn down the hill to Edbrook, and as I approached Edbrook at 107th, I was going east, and a car was coming west up the hill, and so I stopped my car to let him go by, and then I start up all over again and continue down Edbrook, going north then, and I had probably gone, oh, about a quarter of a block or half a block and I notice a group of small children playing there." The

witness then described the manner of the accident. On cross-examination the following occurred: "Q. You arrived over at your brother's house about what time? A. I would say approximately 6:30. Q. And you were over there about how long a time? A. Oh, three or four minutes. Q. You talked to your mother there? A. She came out to me. Q. And you found that she wasn't ready to go home yet? A. Yes, sir. Q. What did she tell you?—to wait there? A. Yes, she told me to wait there. Q. Did she say how long she would be in there? A. No, sir. Q. You had been gone how long from the time you left your mother there, before this accident occurred? A. You mean after she came outside and told me to wait, how long from that? Q. How long after? A. I would say 15 or 25 minutes, somewhere around there. Q. To get back to your mother you had to drive north? A. Yes, sir. Q. And that is the way you were going at the time of the accident? A. Yes, sir." In the conversations that took place upon the evening of the accident nothing was stated by the junior or senior defendant as to any alleged deviation.

There is a mass of decisions dealing with the subject of deviation by a servant from route or instructions. A great many of the leading cases are collated in Berry Automobiles (6th ed.) Vol. 2, sections 1386–1390, pp. 1149–1161. It would be quite impossible without unduly lengthening this opinion to refer to all of the cases cited therein that apply to the instant question. We may call attention, however, to certain general principles stated by that author:

"If the servant steps aside from his master's business, for however short a time, to do an act not connected with such business, the relation of master and servant is for the time suspended, and an act of the servant during such interval is not to be attributed to the master. However, a mere deviation by the servant

from the direct route, or from the strict course of his duty, will not relieve the master from responsibility.

"It is held that if the servant makes a slight deviation from his master's business, for a purpose of his own, the master remains responsible for his acts. Such instances generally occur when the act of the servant is so closely connected with the affairs of the master that, though the servant may derive some benefit from it, it may, nevertheless, fairly be regarded as within the course of his employment. An illustration of this kind is where a chauffeur, after transacting business for his employer, deviates from his course slightly for a purpose of his own, and after accomplishing his purpose, is returning to his employer's place of business when he collides with someone.

"A driver who deviated from his route one or two blocks to go by his father's home for some money he had left there, was held not to have so completely abandoned his employer's business as to defeat the latter's liability for his negligence.

"To relieve the employer from liability, the deviation must be so substantial as to amount to a departure from the service, and must be for purposes entirely personal to the employee.

"The question is sometimes one of fact for the jury, and sometimes one of law for the court. 'In cases where the deviation is slight, and not unusual, the court may, and often will, as matter of law, determine that the servant was still executing his master's business. So, too, where the deviation is very marked and unusual, the court in like manner may determine that the servant was not on the master's business at all, but on his own. Cases falling between these extremes will be regarded as involving merely a question of fact, to be left to the jury.' " (Sec. 1386, pp. 1149–51.)

"If a chauffeur, after deviating from the line of his employment, is at the time an accident occurs pur-

suing his regular course to reach the place it was his duty to drive to, the employer may be held liable for his conduct.

"It is held that, when the servant, having completed the purpose for which he turned aside, is returning to resume his duties, he is, while so returning, engaged in the business of his master." (Sec. 1390, p. 1161.) One of the cases most frequently cited is *Ritchie v. Waller,* 63 Conn. 155. There a driver, after obtaining a load, instead of returning by the direct route, drove four blocks in the opposite direction on a personal mission and an accident occurred before he returned to his usual route. The court, after stating that it has always been a matter of extreme difficulty to apply the law to the ever varying facts and circumstances which present themselves, said (p. 165):

"If the rule of law were that any deviation by the servant 'to carry some business of his own into effect,' was of itself such a departure, the above question would be one of law. But this, as we have seen, is not the rule of law. To decide the question in a case like the present, the trier must take into account, not only the mere fact of deviation, but its extent and nature relatively to time and place and circumstances, and all the other detailed facts which form a part of and truly characterize the deviation, including often the real intent and purpose of the servant in making it." In the able opinion in that case certain principles are announced which seem to be very generally followed by other courts. They are: Where the deviation is marked and unusual, the court may determine that the servant was not on the master's business, but on his own; that where the deviation is slight and not unusual the court may, and often will, as a matter of law, determine that the servant was still executing his master's business; that where the question of the master's responsibility turns principally upon the mere

extent of the deviation by the servant from the strict course of his employment or duty, it has been generally held to be one of fact and not of law, and that cases falling between the extremes will be regarded as involving merely a question of fact, to be left to the jury or other trier of such questions. The Supreme Court of Connecticut held that the case before it clearly fell within the class of cases where the question was strictly one of fact to be decided by the trier, the trial court. The trial court found, upon the facts, that the master was answerable for the act of the servant, and in connection with that finding the Supreme Court said: "We have no hesitation in saying that the court below reached the correct conclusion on the facts found." It seems clear to us that the alleged deviation in the instant case was not so substantial that the trial court would have been authorized to hold as a matter of law that the deviation amounted to a departure from the service of the master and was for purposes entirely personal to the servant. The question of deviation, taken in the most favorable light for defendants, was one of fact for the jury to decide, and they have found against defendants' contention and we find ourselves in accord with that finding. Defendants cite such cases as *Nelson v. Stutz Chicago Factory Branch*, 341 Ill. 387, and *Lohr v. Barkmann Cartage Co.*, 335 Ill. 335, in support of their instant contention. The *Nelson* case has no bearing, under the facts, upon the instant one. There the court held that the possession of the car by the alleged servant was without the owner's permission and was the unlawful possession of a wrongdoer, and that the owner of the automobile was therefore not liable for damages caused by its negligent operation by an employee. In the *Lohr* case the defendant's servant had been directed to take a truck to defendant's garage, but instead of obeying the order he went upon a mission of his own

and was more than four miles away and traveling in an opposite direction from the garage when the accident happened. He had been drinking and "was on a frolic of his own" at the time of the accident, and going to meet some girls. Defendants call attention to the evidence that the junior defendant knew Anthony Kovell and other boys on Edbrooke avenue and they argue that "he went there, very likely, because his friends lived in the block." It is a sufficient answer to this argument to say that junior defendant's testimony does not support any such theory. Senior defendant had the right to inquire of him as to his purpose in going upon the street in question but he did not see fit to interrogate him upon that subject. The jury were fully warranted in finding from junior defendant's testimony that he was on his way to get his mother when the accident occurred.

Defendants state that "each and every count in the declaration credits the ownership, possession and control of the automobile which caused the plaintiff's injury to the defendants, North Roseland Motor Sales, Inc., Frank Kucinskis, Sr., and Joseph Kingma," and they argue that plaintiff has failed to prove ownership, possession and control of the automobile in the three defendants.

"It is not necessary in actions *ex delicto* to prove all the allegations of the declaration. If plaintiff makes out a cause of action by proving the material allegations he is entitled to recover even though there be other averments of the declaration which are not proved. (*Postal Telegraph-Cable Co. v. Likes*, 225 Ill. 249; *Dunham v. Black Diamond Coal Co.*, 239 id. 457.)" (*Reivitz v. Chicago Rapid Transit Co.*, 327 Ill. 207, 209. See also *Weber Wagon Co. v. Kehl*, 139 Ill. 644, 658; *Devine v. Delano*, 272 Ill. 166; *Wood v. Illinois Cent. R. Co.*, 185 Ill. App. 180, 184; *Flis v. City of Chicago*, 247 Ill. App. 128.)

There is no merit in the instant contention.

Defendants further contend that plaintiff failed to prove the allegation in the declaration that senior defendant was the owner of the automobile in question. We have heretofore referred to the evidence bearing upon the question of ownership of the automobile and stated our conclusion in reference to the same. The declaration alleges "ownership, possession and control of the automobile" in senior defendant, and it would suffice if plaintiff proved possession and control in him. We have heretofore referred to the evidence bearing upon his possession and control and the law applicable to the same. (See *Stegman v. Sturtevant & Haley Beef & Supply Co., supra;* 42 C. J., *supra,* and Berry Automobiles, *supra.*)

The final contention of defendants is that the verdict is against the manifest weight of the evidence. We cannot agree with this contention.

The trial court seems to have conducted the trial ably and impartially and many of the errors that are ordinarily assigned in cases of this character are not raised upon this appeal.

The judgment of the superior court of Cook county is a just one and it should be and it is affirmed.

*Affirmed.*

SULLIVAN, P. J., and GRIDLEY, J., concur.