Estate of Esther Williams, Deceased, Caroline H. Faber, Executrix, Appellee, v. Frederick T. Tuch, Appellant.

Gen. No. 41,983.

Opinion filed February 10, 1942.

HENRY A. BLOUIN, of Chicago, for appellant.

RIBAL & STENSLAND, of Chicago, for appellee; EDWARD A. RIBAL and T. N. STENSLAND, both of Chicago, of counsel.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

The inventory filed by the executrix, Caroline H. Faber, in the probate court of Cook county in the matter of the estate of Esther Williams, deceased, listed as one of the assets of said estate:

"Item 8. Deposit in Checking Account, Pullman Trust & Savings Bank, Joint Account with Frederick T. Tuch $2,803.90."

Appellant, Frederick T. Tuch (hereinafter for convenience sometimes referred to as the objector), filed the following objection to the listing of said item as an asset of the decedent's estate:

"Said inventory lists under Item No. 8, joint checking account with this objector in the Pullman Trust and Savings Bank.

"Said deposit in the Pullman Trust and Savings Bank in a joint account with objector, is the property of the said objector."

The executrix filed an answer to the objection of appellant, the pertinent portions of which are as follows:

"She denies that said Frederick T. Tuch has any present right, title or interest in an to said fund; that the decedent herein, at the time of her death an aged widow of or about eighty-two . . . years, lived alone in an apartment at 100 West 113th Place, Chicago, Illinois, and was and had been for many weeks previous to her death under apprehensions that she could not, while incapacitated by a serious illness with which she was afflicted, personally attend to the conduct of her business affairs and in particular promptly pay her obligations as they accrued and became due as she had been wont to do previously thereto; that on or about, to-wit the 9th day of July, 1940, that is to say thirteen . . . days before her death, she lay gravely ill in a hospital known as Little Company of Mary Hospital, at Chicago, Illinois, and was visited then and there by the aforesaid Frederick T. Tuch; that said Frederick T. Tuch then and there agreed with her to pay in her behalf the bills for her certain personal expenses which had accrued and which were then about to accrue; that in order to provide funds for said purpose it was then and there agreed upon by and between said decedent and said Frederick T. Tuch to create, for that purpose, and no other, a joint interest in said decedent's said bank account; that pursuant thereto said Frederick T. Tuch did pay, out

of said proceeds, certain bills of said decedent and that prior to said decedent's death said Frederick T. Tuch withdrew from said account funds for no other purpose; and that since decedent's death said Frederick T. Tuch has withdrawn said funds and applied them to his own use and purpose and has refused and continues to refuse to deliver said funds to said Executrix in response to her repeated demands to that end.''

The probate court after a hearing entered an order, the material portion of which is as follows:

''That the evidence sustains the objection of said Frederick T. Tuch to the inventory, with respect to the joint checking account in the name of the deceased and the said Frederick T. Tuch and said joint account as listed in the inventory is therefore decreed to be the sole property of Frederick T. Tuch, surviving joint tenant.''

The executrix perfected an appeal from this order to the circuit court, which, after a hearing on the evidence submitted, entered an order which found and adjudicated as follows:

''That the aforesaid Esther Williams, deceased, did not during her lifetime convey, transfer, give, sell, set aside or assign to Frederick T. Tuch, of Chicago, Cook County, Illinois, all or any part of the proceeds of a certain checking account in the sum of $2,803.90 in the Pullman Trust and Savings Bank, an Illinois corporation, having its principal place of business at Chicago, Illinois, standing upon the books and records of said corporation jointly in the names of Esther Williams and Frederick T. Tuch;

''That said Frederick T. Tuch does not have and never did have any right, title or interest in and to said proceeds; and

''That aforesaid proceeds became upon the death of aforesaid Esther Williams, deceased, and are, the sole property of Caroline H. Faber, as executrix under the Will of Esther Williams, deceased.

''. . .

"That the objection of Frederick T. Tuch to the inventory filed by Caroline H. Faber, as executrix under the will of Esther Williams, deceased, in respect of the inclusion of a certain checking account in the sum of $2,803.90 in the Pullman Trust and Savings Bank, an Illinois corporation, having its principal place of business at Chicago, Illinois, standing on the records of said corporation jointly in the names of Esther Williams and Frederick T. Tuch, be and it is hereby overruled."

It is to review this order that the objector, Tuch, prosecutes this appeal.

The decedent, Esther Williams, was 81 years old at the time of her death on July 22, 1940. She left as her heirs three nephews and Frederick T. Tuch, who was her grandnephew. For sometime prior to July 8, 1940, she was a patient at "Techny." On that date Tuch visited the decedent at the institution at Techny, Illinois, and, upon being informed by one of the nuns in charge at said institution that Mrs. Williams was "very low," he had her removed in an ambulance that same day to the Little Company of Mary Hospital in Chicago. The decedent had a checking account under the name of "Esther Williams" in the Pullman Trust and Savings Bank. On July 9, 1940, Tuch went to said bank and requested a "joint account card." According to Albert E. Price, cashier of the bank, Tuch told him that the reason he wanted the joint account card was "that Mrs. Williams wished to place this in a joint account so he could take care of the expenses of the estate." Tuch brought the bank's form of joint tenancy agreement to the hospital, where, on July 9, 1940, the decedent attached her signature thereto as "Mrs G. Williams" and the objector attached his signature as "Fred T. Tuch." After having been executed the joint tenancy agreement was returned to the bank on the same date and Mrs. Williams' individual checking account was changed to a joint account

against which both the decedent and Tuch were authorized to draw checks.

Checks were thereafter drawn against the account by Tuch for $511.50 and $11.45 on July 22, 1940, and July 30, 1940, respectively. Neither the purpose for which these withdrawals were made nor the amounts thereof are questioned. $2,000 withdrawn from the account by Tuch on November 22, 1940, and the balance of $803.90 remaining in said account, amounting in the aggregate to $2,803.90, constitute the fund involved in this controversy.

While there was some question on the trial as to the authenticity of the decedent's signature on the joint tenancy agreement, we think that it sufficiently appears from the evidence that she signed same.

Dr. Charles J. LaHodney, who was a friend of Tuch and his physician for 20 or 25 years, was called in by the latter to attend the decedent. He testified that he first saw her on July 8, 1940, at the Little Company of Mary Hospital and that on that day "she said she wanted to make arrangements so Mr. Tuck [Tuch] would take care of her—have some kind of account where Mr. Tuck [Tuch] would take care of her expenses and so on and that he should have the balance of that money that was in the bank."

Dr. LaHodney, when asked concerning the state of decedent's "mental process," testified, "Well, she was very lucid at times and sometimes she would have a little temperature and she was a little fussy. In the main she was very good, she wanted to go home about four or five days after she was there; when she came in the hospital she was suffering from some cardiac distress, she had a fibrillation, that is, a rapid action of the heart with a little sciatica."

The hospital report under the caption "Progress Notes" contains the following entries:

"7/8/40    Dr. LaHodney arrived at time of physical exam. Patient appears extremely weak

and does not respond very well. (Hultgen)

"7/9/40 Patient semi-stuporous. Seen by Dr. La-Hodney and Dr. Smith. T. 99.4. Liver enlarged 3 F below costal margin and tender. Shifting dullness in flanks."

Bertha Stevens, one of the nurses who attended decedent at the hospital during her last illness, testified that she saw the testator sign the joint tenancy agreement on July 9, 1940, and that after she signed same "she gave it back to Mr. Tuck [Tuch] and told him he was to take care of all her expenses while she was in the hospital and he was to have the rest." On crossexamination Miss Stevens admitted that she testified at the hearing in the probate court that when the decedent "signed the card and told Mr. Tuck [Tuch] to pay her expenses . . . that is all she said." She also testified on cross-examination that "I have gone over the case and remember better now." It should be noted that she testified at the circuit court hearing on May 21, 1941, and at the probate court hearing on February 28, 1941.

Caroline H. Faber, the executrix, testified that she had a conversation with Tuch on July 24, 1940, in which he told her "that he was on his way to Wisconsin to visit his family at a resort and while en route decided to stop at Techny to see his aunt, Mrs. Esther Williams, and a Sister in charge said that she was very glad that he stopped because Mrs. Williams was very low. . . . So he stated that an ambulance had to be hired to take her to the hospital and nurses expense and so forth and Mrs. Williams said, 'Pay all my bills immediately. There is my check book, just sign the checks,' and Mr. Tuck [Tuch] replied, 'Of course, I knew I couldn't do that and offered to pay the bills and she could reimburse me later, but Mrs. Williams said "no, pay them right away," '" so he called the bank and was informed that a card would have to be

signed authorizing him to sign the checks and then stated, 'When you get the checks from the bank and the statement, you will find that every check I issued was for expenses only and I have also written Auntie's name on each check.' "

The executrix also testified that Tuch's attorney telephoned her sometime in September 1940, in response to a letter which she had written him on August 29, 1940; that said attorney stated "I am representing Fred Tuck [Tuch] in the estate of Esther Williams, deceased, . . . We are going for the checking account and postal savings—at least we are going to make a stab at it"; that she took this statement down in shorthand; and that, although she had handled the decedent's affairs for many years, she did not know of her having any other checking account than that here in question.

Tuch testified that he recalled his conversation with the executrix and that "I told her that she [decedent] had had a checking account signed into a joint tenancy and that I had paid all of the bills and that the balance of the amount was a donation to me. My aunt gave that to me."

The theory of the objector, Tuch, as stated in his brief is that "the joint tenancy account was established to enable him to pay the obligations of the hospitalization and medical care of Esther Williams and that the balance was his in any event."

It should be noted at the outset that the controversy here is not between the bank and the joint depositors or either of them and that the rules governing the relations between a bank and a depositor or the debtor-creditor relationship are not applicable to the situation presented by the record in this case. The sole question we are called upon to decide is whether the decedent intended, when she signed the joint tenancy agreement making Tuch a joint party to her checking account, to make him a gift of the fund remaining in

said account after her medical and hospital expenses had been paid by him out of same.

As already shown Tuch happened to visit the decedent at Techny and found that she was "very low." She was in the habit of paying her bills promptly as they accrued. Because of her condition she was unable to make out and sign her checks to pay her bills and she requested Tuch to do so. He knew that her checks bearing his signature would not be honored and he suggested that she would have to authorize the bank to honor checks drawn by him against her account. After he had her removed to the 'hospital in Chicago he secured a joint account card from the bank and procured her signature thereto. Tuch admitted that he never made a deposit in the bank account in question and had absolutely no title to or interest in same except such as may have resulted from the execution of the joint tenancy agreement by the decedent.

The claim of Tuch that the decedent made a gift to him of the fund in controversy finds support only in his own testimony and that of Dr. LaHodney and Miss Curtis, the nurse. Although the nun at Techny stated that Mrs. Williams was "very low" on the morning of July 8, 1940, and the Chicago hospital record of the same day shows that she "appears extremely weak and does not respond very well" and that Dr. LaHodney "arrived at the time of physical exam.," the doctor testified that the decedent on said date announced to him that she wanted Tuch to "take care of her expenses and so on and that he should have the balance of that money that was in the bank." This statement was supposed to have been made by the decedent the day before she signed the joint account card. It strikes us as most strange and amazing that Mrs. Williams, who was "very low" on the morning of July 8, 1940, who was "extremely weak" and did "not respond very well" on the afternoon of the same day when Dr. LaHodney saw her and who was in a "semi-stuporous"

condition the next day, would launch into a conversation concerning her finances with Dr. LaHodney, whom she had not previously known and had never seen before. We think it highly improbable that the decedent, who was so seriously and dangerously ill, would make any such statement as the doctor attributed to her.

It will be recalled that, although Miss Stevens, the nurse, testified at the circuit court hearing on May 21, 1941, that after signing the joint account card on July 9, 1940, the decedent ''gave it back'' to Tuch and ''told him he was to take care of all her expenses while she was in the hospital and he was to have the rest,'' she was forced to admit that at the probate court hearing on February 28, 1941, she made no mention of any statement by the decedent that Tuch ''was to have the rest.'' It should be borne in mind that she testified that her memory was better on the occasion of the later hearing in the circuit court as to what occurred on July 9, 1940, than it was when she testified at the earlier hearing in the probate court and it is also significant that when the decedent was supposed to have made the statement to Miss Stevens on July 9, 1940, that Tuch ''was to have the rest,'' the hospital record discloses that Mrs. Williams was in a ''semi-stuporous condition'' on that day.

Both the executrix and the bank cashier testified that Tuch told them that decedent's only purpose in changing her individual account to a joint account with him was to enable him as a matter of convenience to pay her medical and hospital expenses out of her checking account. While Tuch denied the testimony of the executrix in this regard and testified that he stated to her that the decedent gave the fund in question to him, he did not deny the testimony of the bank cashier.

Since the testimony of Dr. LaHodney was open to grave suspicion and discredited by the hospital record and since the testimony of Miss Stevens, the nurse, was also discredited by the hospital record and im-

peached as to the most material portion thereof by her admission that in her testimony at the probate court hearing she said nothing about the decedent making a gift to Tuch of the money in her bank account or any part of it, the trial court was justified in disregarding the testimony of both of these witnesses.

There is not a particle of evidence in the record to show any reason why the decedent should have made a gift of the money in her bank account to Tuch and the conclusion is irresistible that when the decedent signed the joint tenancy agreement she had no realization of its contents or meaning and that if she were capable of any intention at all at the time in regard to her bank account, it was merely to authorize Tuch to draw checks against same for the payment of her medical and hospital bills.

It is the established law that where gifts are first asserted after the death of the donor, they are regarded with suspicion by the courts and the rule requiring gifts to be established by clear and convincing evidence is especially applicable in such cases, particularly where a confidential relationship existed between the parties. (28 C. J. 681, sec. 86; *Humble v. Gay*, 168 Cal. 516, 520; *In re Estate of Turner*, 244 Pa. 568, 572.) "The burden of proving all facts required to create a valid gift *inter vivos* is on the donee. The essential facts to be established are the delivery of the property to the donee, with the intent to pass title. To sustain the gift the proof must be clear and convincing." (*People v. Polhemus*, 367 Ill. 185.)

While it is true that the decedent signed the joint tenancy agreement authorizing Tuch to draw checks against her bank account, the objector utterly failed to show by any credible evidence that Mrs. Williams signed such agreement with any intention of making a gift to him of the money in her bank account or of any balance left therein after he paid her medical and

hospital bills. No such evidence was presented by Tuch as was necessary to establish a valid gift.

In view of what has been said the fact that the joint tenancy agreement included therein a survivorship clause carries no significance and since it clearly appears from the facts and circumstances in evidence that a confidential relationship existed between Tuch and the decedent, that she was completely under his domination and that she undoubtedly had no conception of what she signed, said joint tenancy agreement is without legal effect in so far as the objector is concerned. As between the bank and Tuch and the decedent, and after the latter's death, the executrix of her estate, the bank would be justified in treating the deposit as a fund in which the parties had a joint interest. But as between Tuch and the decedent, the money in the account belonged always and wholly to Mrs. Williams and after her death to her legal representative. Such legal title, if any, as Tuch had in the joint account deposit, he held in trust for the decedent, and that trust in personal property could be established, as it was here, by parol. Notwithstanding the form in which the account was made out, Tuch was acting merely in the capacity of an agent with limited specific obligations and his agency terminated upon his performance of such obligations. (*Bradford v. Eastman,* 229 Mass. 499.)

No sound reason having been advanced as to why the judgment order of the trial court should be disturbed, same will be affirmed.

*Judgment affirmed.*

SCANLAN, P. J., and FRIEND, J., concur.