Dixon National Bank, Executor of the Estate of Eva M. Robinson, Deceased, Petitioner-Appellee, v. Cora Morris, Respondent-Appellant, and the Ashton Bank, Respondent.

Gen. No. 11,858.

Second District.

September 15, 1964.

308

Albert N. Kennedy, and J. Richard Keller, both of Dixon, and Ralph M. Eaton, of Mt. Carroll, for appellant.

Dixon, Devine, and Ray & Morin, of Dixon (George K. Ray, of counsel), for appellee.

MORAN, J.

This is a citation proceeding brought by the Dixon National Bank, as Executor of the estate of Eva M. Robinson, deceased, to determine title to a bank account which the deceased had held jointly with her daughter, the defendant Cora Morris, at the defendant Ashton Bank. The lower court found the account to be the property of the estate and ordered the defendant bank to pay over the balance to the Executor.

The defendant Cora Morris brings this appeal, claiming that the judgment of the lower court is against the manifest weight of the evidence.

By her will, Eva Robinson left half of her estate to the defendant Cora Morris and the other half to various grandchildren. The question involved here, then, in practical terms, is whether Cora takes the whole bank account as a surviving joint tenant or whether she only takes a share of it as an heir.

The deceased, Eva Robinson lived with her husband Howard on a farm until his death in 1958. Then, she rented out the farm, and took up residence in a house trailer which she parked in the yard of the defendant Cora Morris and her husband, Ernest. The evidence is in some conflict as to whether Eva paid rent to Cora and Ernest for this privilege of parking her trailer in their yard, but it appears that she did.

Early in 1961, Eva sold the farm for $15,000. It appears that Cora and Ernest were in favor of the sale, and, in fact, Eva paid Ernest $650 as a commission

for finding a buyer. There was discussion as to what should be done with the proceeds of the sale, and the deceased finally decided, largely on the advice of Cora and Ernest, to put the money in a savings account at the Ashton Bank. The account was opened on March 24, 1961, with a deposit of $13,000. A second deposit was made by the decedent in January of 1962. The balance at the time of the trial was $15,852.71. It is undisputed that Cora Morris made no deposits to the account and that all of the money in the account was supplied by the deceased from her own personal funds.

The signature card signed by the deceased and Cora Morris when the account was opened recites that the money in the account

> "shall be our joint property and owned by us as joint tenants with right of survivorship; and upon the death of either of us any balance in said account shall become the absolute property of the survivor. The entire account or any part thereof may be withdrawn by, or upon the order of, either of us or the survivor."

■■■■ This language is sufficient under our statute on Joint Rights and Obligations, Ill Rev Stats c 76, 2(a), to create rights of survivorship in a bank account. Cora Morris argues here that this deposit agreement creates a presumption of donative intent that can be overcome only by clear and convincing evidence that no gift was intended. We think that she attempts to place too heavy a burden on the plaintiff. All the deposit agreement does is to show prima facie a donative intent on the part of the original owner of the funds. In re Estate of Schneider, 6 Ill2d 180, 187, 127 NE2d 445 (1955). Once evidence is adduced tending to show that there was not an intention to make a gift, this prima facie case is met, and the burden of going forward with the evidence shifts back to the donee.

In re Estate of Corirossi, 36 Ill App2d 249, 252, 183 NE2d 305 (2d dist 1962). While the burden of proof—as distinguished from the burden of going forward with evidence—always remained with the plaintiff, still that burden was never more than to establish its case by the greater weight of the evidence.

Conceding, then, that the Executor had the burden of proving there was no gift—not by clear and convincing evidence, but simply by the greater weight of the evidence—we turn to what the evidence was.

Much of the Executor's proof was in the form of admissions elicited from Cora in her discovery deposition and during adverse examination at the trial. She stated that at the time the deposit was made her mother was seventy-three years old, in failing health and had poor eyesight. She admitted that Eva could not read fine print. (The above-quoted deposit agreement is in extremely fine print.) Cora further stated that she was the one who suggested to her mother that the account be made a joint one:

> "It was during this time she told me she was going to put the money in the savings account, and I suggested to her at that time perhaps it would be best if she put or added my name to that savings account, if anything happened in order to have somebody else to pay the bills. I mentioned it to her for the simple reason that if sometime she might become ill or a time she would not be able to go to town, and she needed money, it would be possible for me to draw it for her."

Cora testified that her mother was in fact always concerned about getting her bills paid on time. Eva did not commit herself at the time of this conversation, however, when Cora accompanied her to the bank a few days later to make the deposit, Eva still had not indicated that she was going to put Cora's

311

name on the account. While they were at the bank, Cora suggested again that her name be added, and Eva agreed.

Eva kept the passbook at all times, and Cora never made any deposits or withdrawals. The Executor introduced a letter and a Christmas card written by Eva which reflect her attitude toward Cora and thus bear upon the issue of donative intent. The date on the letter is unclear, and the card has no date, but from their context it appears that the letter was probably written in 1960, before the account was opened, and that the Christmas card was written in December of 1961, after the account was opened. (The record nowhere shows the date of Eva's death, and we can only assume it was early 1962.) In any event, no question of any kind is raised on this appeal as to the admissibility of these writings. The letter, written to a former daughter-in-law, reads in pertinent part:

"Dear Lucille,

Will try to write to you. I just can't think straight or do anything right.

Cora got me to sell my things. Now she wants me to sell my place. I don't like it at all. I guess they will put me away. If she does I will cut my wrist some night. I am so blue I don't know what to do.

Well Lucille tell me what to do. I have been so sorry I sold all of my furniture. Lucille if you come down I will give you some dishes. I rent my place. Now I have to paper and paint.

. . . I have been sick. I get so tired and alone.

. . . Oh I wish I could see you all again but I just wish I could go to Howard. I miss him so much. Ernest and Cora swear at me so I just don't know how to take it. Now he wants me to

312

sell my place. When that goes I will end it all.

. . . Cora has company and goes away so much she never asks me to go with her. I am living in hell right here. . . .

Will close with love, Dear,

Mrs. Eva Robinson"

The Christmas card, written to a friend, was as follows:

"Dear May,

How are you by now? I sold my place and am living off the money I got for the place, $15,000.00. When it is gone I will go to the poor house. I know Cora won't take me. She doesn't want me out here now. It is so hard to see my kids don't want me at all around. I guess I am losing my sight. I can't see at times at all. The doctor says he could not do anything for me. I cry so much. Cora she gets mad at me when I do. I won't get anything for Christmas. Cora doesn't get me anything so I miss Howard so much. He was good to me. . . .

/s/ Eva Robinson,
Love to all,
Merry Christmas"

After Eva's death, an attorney representing the Executor asked Cora about the joint bank account. She replied that it had been set up so that she could pay bills for her mother in the event of her illness. She mentioned nothing at that time about the survivorship feature of the account.

We will now consider the evidence which tends to support the proposition that a gift to Cora was intended.

Cora testified that when the account was opened, Mr. Clifford Schafer, the cashier at the bank, ex-

plained to Eva that by adding Cora's name to the account it became a joint account and that in the event of death the money would go to the survivor. Eva replied, according to Cora, that this was the way she wanted it.

Cora did not call Mr. Schafer as a witness, but he was called by the Executor. He testified that he had no recollection of the specific conversation that took place at the time the account was opened. He stated that the usual procedure when such an account is opened is that "we tell them this is for a joint account."

Cora testified at the trial that Mr. Shafer read the deposit card to Eva before she signed it. She admitted that in her discovery deposition she had testified that Eva had read the card herself.

Mrs. Edith Pitzer, the sister of Ernest Morris, Cora's husband, testified that Eva told her in the winter of 1961, that she had sold the farm and put the money in an account "with Cora, for Cora." Mrs. Pitzer also testified that prior to the sale of the farm Eva had told her that Cora would get the farm. The witness further testified that she visited with Cora and Ernest frequently and it is apparent that their relationship was a close one.

Finally, Cora points to the fact that the farm had been held by Eva and her husband in joint tenancy, and argues that Eva must, therefore, have been familiar with the survivorship aspect of that form of ownership.

It is clear that the inference of a gift arising from the deposit agreement can be overcome by evidence that the joint tenancy account was created merely for the convenience of the original owner of the funds. In re Estate of Schneider, supra; In re Estate of Corirossi, supra; In re Estate of Williams v.

314

Tuch, 313 Ill App 230, 39 NE2d 695 (1st dist 1942). We think the evidence of the Executor is sufficient to show that this was the situation here, and that no gift to Cora was intended. In order to find the judgment of the lower court to be against the manifest weight of the evidence, we would have to find the existence of donative intent to be "clearly evident." Arboit v. Gateway Transp. Co., 15 Ill App2d 500, 507, 146 NE2d 582 (2d dist 1957); Ritter v. Hattberg, 14 Ill App2d 548, 555, 145 NE2d 119 (2d dist 1957). This we do not find.

The Executor also urges that a fiduciary relationship existed between Cora and her mother and that any gift which was made as a result of this relationship is voidable. Since we hold that the evidence is sufficient to show that there was no gift, we need not pass on this point.

The judgment of the lower court is affirmed.

Affirmed.

ABRAHAMSON, P. J. and CARROLL, J., concur.