In the Matter of the Estate of Janet Skinner, Deceased. Russell W. Root, Petitioner-Appellant, v. Joseph Dondanville, et al., The Grundy County National Bank, Morris, Illinois, and Willard E. Olson, Its President, The First National Bank of Wilmington, Wilmington, Illinois, and Lawrence A. Bitterman, Jr., Its President, and Illinois Securities Co., Joliet, Illinois, and John F. Ruva, Its Vice President and Secretary, Respondents-Appellees.

Gen. No. 69–16.

Third District.

July 3, 1969.

Rehearing denied September 8, 1969.

268

Murphy, Timm & Lennon, of Joliet, for appellant.

Reid, Ochsenschlager, Murphy & Hupp, of Aurora, for appellees.

ALLOY, J.

This cause originated as a citation proceeding under the terms of the Probate Act for the purpose of recovering property which was alleged belonged to the estate of Janet Skinner. The property involved consisted of corporate stock worth about $70,000 and of a bank account totaling approximately $10,000. The respondents who held the property contended that they received the stock as a gift. The trial court agreed with such contention and respondents' contention that the bank account was not the property of the Janet Skinner estate. The estate has appealed.

The decedent Janet Skinner was a spinster who died January 13, 1964 (at the age of 96). She was survived by her brother, David Skinner, who never married and who died in February of 1966. A sister, Lida Dondanville, died in October of 1966 leaving surviving three children, John Dondanville, Joseph Dondanville, and Janet Dondanville Schroeder. Another sister, Isabel Skinner Root, predeceased Janet Skinner and left surviving three children, petitioner Russell Root, David Root, and Gordon Root. Decedent Janet Skinner left no will.

Joseph Dondanville had assisted his Aunt Janet Skinner for many years with her business affairs. He collected all the moneys due her, handled her bank accounts, wrote checks for her, handled her corporate stock pur-

chases and collected dividends for her. It was admitted by all parties that Joseph occupied a fiduciary relationship with his Aunt Janet in connection with her business affairs. Joseph moved to Florida in 1957 but continued to work in the fiduciary capacity for his aunt. He purchased the stock in question in this proceeding and had such stock registered in his name and Janet's name as joint tenants. He testified, however, that the stock was really Janet's stock and he held it as trustee for her. He also testified that he purchased the stock with Janet's money. The certificates were at all times in the possession of Joseph Dondanville prior to the transfer in question in this proceeding. Joseph Dondanville received the dividends, cashed the checks and paid Janet the money from the dividends. He told all parties, including David Root, that the stock held jointly was really Janet's stock.

In October 1958, Janet Skinner was 91 years old. She did her own housework, cooking and ironing. She read with a magnifying glass and there is testimony that she read with a magnifying glass for five years after that date or up until approximately two months before her death in 1963. In October of 1958, Joseph Dondanville came from Florida to Illinois and brought with him the stock certificates in question. There was no testimony as to why he brought the certificates. Joseph Dondanville testified that he and Janet Skinner and his mother, Lida Dondanville (who died prior to the hearing) and her brother, David Skinner (who died prior to the hearing), were present at such time. Joseph stated that he and his mother, at the request of Janet Skinner, signed Janet's name to the various stock certificates and that they tried to write Janet's signature as Janet would write it in her kind of signature. At the hearing, a handwriting expert testified that it was his conclusion that Janet Skinner had not signed any of the stock certificates and that the name "Janet Skinner" was written on all of the certificates by Joseph Dondanville. He stated that Lida Don-

270

danville had not written on any of the certificates. Joseph Dondanville thereafter testified again, after the handwriting expert's testimony, and stated that, in view of the expert's testimony, he was willing to admit that he had written Janet's name on all the certificates. He was the only survivor of the group who was present when the stock certificates were signed in October of 1958.

After the signatures on the stock certificates were written, Joseph Dondanville took them to Illinois Securities Co. in Joliet and directed that there be transferred one-third of the stock to himself, one-third to his brother, John Dondanville, and one-third to his sister, Janet Schroeder. Joseph Dondanville also signed his own name to the stock certificates as a joint tenant at the Illinois Securities Co. A representative of Illinois Securities Co., a Mr. Ruva, who guaranteed the signatures, testified at the hearing. He stated that before Joseph Dondanville brought the stock certificates in, Janet Skinner called him on the phone and she told him she had signed the certificates and that Joseph was bringing them in. He stated he did not examine the signatures thoroughly but he knew that they contained Janet's signature because she had told him on the phone she had signed them. Janet Skinner had never been in Ruva's office since Joseph had handled all stock transactions for her. Ruva guaranteed the signatures and the records of Illinois Securities Co. showed that at least part of the certificates were mailed directly to Joseph Dondanville in Sarasota, Florida. Joseph testified, however, that he picked the securities up personally and took them to Wilmington, Illinois. When the witness Ruva was asked about the difference between the sample signature of Janet Skinner and the signatures on the stock certificates, he admitted that it would be perjury on his part to state that Janet Skinner did sign the certificates. He also stated that he had followed Joseph Dondanville's direction in connection

with transfer of the stock. Ruva's testimony was also that he had called Janet Skinner after Joseph Dondanville brought the stock in and that she told him she had signed such certificates.

Joseph Dondanville had testified directly that he, in fact, had signed Janet's name to the certificates trying to imitate Janet's signature. There was evidence also that two weeks prior to the hearing, witness Ruva had talked with the attorneys for the petitioners with respect to the certificates and, when told that they were not the signatures of Janet Skinner, he said nothing whatsoever to the petitioner or attorney and made no mention of having had any telephone calls from or making any telephone calls to Janet Skinner. John Dondanville, brother of Joseph, in whose name one-third of the stock was registered, stated that he knew nothing of the signing of the stock and did not even learn of the gift until the spring of 1959, when Joseph told him that he owed his share of the gift tax on the gift. He testified that the first time he saw the actual certificates was when he and his wife were alone with Janet Skinner. He stated that he learned he was to collect the dividends on the stock transferred to him and send these dividends to Janet but report them on his own income tax. He did not recall who told him to do this. He also stated that his Aunt told him that she did not want the Roots to have any more of her property. There was some contradictory testimony on this subject. The other transferee, Janet Schroeder, testified that she first learned of the transfer from her mother, Lida, around Christmas of 1958. She stated that she received the certificates from Janet Skinner in June 1959 when just she and Janet Skinner were present. She stated that her mother, Lida, explained to her that she was to pay the gift tax on the transfer and return all of the dividends to Janet Skinner. She stated she never discussed the gift tax or dividends with Janet Skinner. She stated she felt that

272

the reason for the stock transfer was because Janet Skinner had not been invited to Russell Root's wedding in 1924.

After the stock transfer in October 1958, Janet Skinner had paid no gift tax and there was evidence that the gift tax return was filed by Joseph Dondanville after it was prepared by an accountant selected by him. This accountant had also died prior to the hearing. Joseph admitted that he might also have signed the gift tax return for Janet Skinner. The gift tax return showed an outright gift without reservation of income. After the stock transfers in 1958, Janet Skinner continued to receive dividends in cash as John paid his share to Joseph and Joseph put his share with this amount and took Janet Schroeder's share out of an account which she and Joseph had together. Thus, Janet Skinner received dividends from Joseph in cash after October 1958 in the same manner as she had received them from Joseph prior to October 1958. Joseph actually sold some of this stock but continued to send the dividends to Janet Skinner just as if she still owned the stock. There was evidence that a division of property had been made by David Skinner, a brother of Janet, equally between the Roots and the Dondanvilles. Joseph Dondanville and David Root were Co-Executors of the John Skinner estate, another brother of Janet, and his estate was also left equally to the Roots and the Dondanvilles.

David Root talked with Joseph Dondanville on several occasions about the stock which David knew was at one time in the joint names of Joseph and Janet. While Joseph was evasive in his answers when asked directly if he still had the stock, Joseph Dondanville stated, "Oh yes, if she passes away it will be taken care of." None of the Roots learned of the 1958 stock transfer until after the death of Janet Skinner in 1964. When no administration was instituted on the Janet Skinner estate for a period of two years, David Root filed for appointment

as administrator, and this caused Lida to file, and eventually the Union National Bank was appointed as such administrator. Joseph Dondanville testified that the reason he did not tell the Roots about the 1958 transfer was to keep family harmony as long as Janet was alive, as Janet wished him to do this.

There was some evidence that the Dondanvilles were favored more by Janet than the Roots as the Dondanvilles visited her more often. There was also evidence that Janet Skinner had given the Dondanville children (that is the children of Joseph, John and Janet) $500 government bonds prior to 1958 when no such gifts were made to any of the Root family.

With respect to the bank deposit under consideration, eleven days before Janet Skinner died, John Dondanville deposited $12,000 in cash in a savings account and $2,310 in a checking account and both accounts were set up in the names of "John Dondanville and Joseph D. Dondanville, Agents." John Dondanville discussed these funds and the ownership of the funds with a Mr. Olson of the bank and, after such conversation, Mr. Olson suggested that the word "Agent" be used so as to distinguish such account from John's own account, and Olson also testified that John said when he opened the account, "This is money we have gotten for Aunt Jen. It's too much to be laying around and we will do this with it." Janet Dondanville Schroeder testified that David Skinner told her that he, David, had given John the money for Aunt Janet and it was to be used for Lida if there was any left after Aunt Janet was gone. In a conversation after Janet died and before she was buried, John Dondanville told Russell Root that he had money of Aunt Jen's to use to pay her funeral expenses and that it was around $17,000. John further said he would make an accounting of the funds to the whole family including the Roots. About two weeks after Janet died, John withdrew $2,000 in the account and paid this to David Skinner to reim-

274

burse him for medical bills of Janet which he had paid. Janet's funeral bill and other bills were paid out of this account. There was still $10,763.73 in checking and savings accounts when David Skinner died in February of 1966. Four months later, John Dondanville withdrew the balance in both accounts and put the money in the David Skinner Estate. The name of David Skinner had never appeared on any of the accounts. John Dondanville, however, testified that David Skinner had given him this cash to open the accounts and told him to use it to care for Aunt Jen and Lida, if necessary.

 The principal issue before us is whether a valid gift of the stock was established by the evidence presented in the trial court. In a citation proceeding of the type before us, the individuals holding the property contending they received the property as a gift, had the burden of proving such gift (Dudley v. Uptown Nat. Bank of Moline, 25 Ill App2d 514, 167 NE2d 257; In re Estate of Hackenbroch, 35 Ill App2d 155, 182 NE2d 375). As stated in the case of In re Estate of Hackenbroch, supra, at page 161:

> "The burden of proof of the gift is on the donee to prove all essential facts of a valid gift. The essential facts are the delivery of property by the donor to the donee. . . ."

(To the same effect is Pocius v. Fleck, 13 Ill2d 420, at 427, 150 NE2d 106.) As further outlined in Dudley v. Uptown Nat. Bank of Moline, supra, at page 521:

> "To sustain the claimed gift the proof must be clear, satisfactory, unequivocal, and convincing—there should be no uncertainty as to either the claimed intent or the claimed delivery."

This observation is particularly applicable where the gifts are first asserted after the death of the donor. As pointed

275

out in the Estate of Williams v. Tuch, 313 Ill App 230, at page 240, 39 NE2d 695:

> "It is the established law that where gifts are first asserted after the death of the donor, they are regarded with suspicion by the courts and the rule requiring gifts to be established by clear and convincing evidence is especially applicable in such cases, particularly where a confidential relationship existed between the parties."

Mere possession of the property alone is not sufficient to prove a valid gift. As stated in Pocius v. Fleck, supra, at page 428:

> "Mere possession by one claiming a gift, after the death of the donor, is insufficient to prove a valid gift, (In re Estate of Jarmuth, 329 Ill App 619,) and gifts first asserted after the death of the donor are regarded with suspicion. . . ."

Testimony of a donee of property under such circumstances is of doubtful credibility. As outlined specifically in In re Estate of Hackenbroch, supra, at page 162:

> "Respondent argues that his testimony as to the gift, properly admitted here, must be considered as true if there is no countervailing evidence. (Chance v. Kinsella, 310 Ill 515, 523, 142 NE 194 (1924).) We do not agree. In a citation proceeding, the sole testimony of a donee as to what was done or said to him by a deceased donor is of questionable credibility and should be carefully scrutinized, as direct disproof of such declarations and conduct of the deceased donor is rarely possible. Such testimony should be considered, but sufficient corroborative evidence is required so as to make the proof of a gift clear and convincing. Rothwell v. Taylor, 303 Ill 226, 230, 135 NE 419 (1922); Keshner v. Keshner, 376 Ill 354, 363, 33 NE2d 877 (1941); People

276

ex rel. Williams v. Wismuth, 2 Ill App2d 109, 117, 118 NE2d 881 (1954)."

In addition to the foregoing requirements, the fact that one of the donees stands in a fiduciary capacity or a confidential relationship to the donor requires that the proof necessary to establish the gift be even more clear, convincing and unequivocal. As stated in In re Estate of Jarmuth, 329 Ill App 619, 629, 70 NE2d 336:

> " 'Transactions with a fiduciary are presumptively fraudulent, and will be stricken down unless he establishes their fairness by clear and convincing proof. Mors v. Peterson, supra; Kosakowski v. Bagdon, supra,' (Seely v. Rowe, 370 Ill 336, 342.)

> " '. . . Where a confidential or fiduciary relation is established between parties, courts of equity scrutinize very closely any transaction or contract between the parties by which the dominant party secures any profit or advantage at the expense of the person under his influence. All transactions between parties in this relation are presumptively fraudulent and void, and before a court of equity will permit such contract to stand, the proof must be clear and convincing and satisfy the conscience of the chancellor that good faith has been exercised and that the confidence reposed in the beneficiary of the contract has not been betrayed by him. Beach v. Wilton, supra [244 Ill 413], and authorities there cited.' "

Such gifts and transactions made between parties who stand in a fiduciary relationship are examined very carefully by the courts and where a confidential relationship exists between the alleged donor and donee, the burden of proving the gift by clear and convincing evidence is especially imposed upon the donee or donees (In re Estate of Hackenbroch, supra, at page 161; In re Estate of

277

Vercillo v. Gagliardi, 27 Ill App2d 151, 158, 169 NE2d 364).

Relating these principles to the facts in the cause before us, it is clear that Joseph Dondanville was in a fiduciary relationship to the donor. All of the circumstances in the case including the age of the donor make it especially important that the transactions before us be viewed with great care and in the light of the precedents referred to in this opinion. It is notable in the cause before us, that the gifts claimed were not so asserted until after the death of the donor and that the donee who was handling this transaction stood in a fiduciary relationship to the donor. Under such circumstances, to overcome the presumption of fraud arising from the fiduciary relationship, it becomes particularly significant that the gifts must be shown by clear, convincing and unequivocal evidence. We do not believe that the evidence in this cause meets such standard. We note that the evidence indicates that Janet Skinner used a magnifying glass to read which might indicate she had some difficulty in signing her name but there was no evidence that she could not write her name in October of 1958. The evidence showed that she could in fact read with a magnifying glass up until two months before her death.

The only independent evidence of a gift arises from the testimony of witness Ruva. He stated that Janet called him and said that she had signed the stock certificates before Joseph brought the stock certificates into his office. He stated that after Joseph brought in the certificates, he called Janet Skinner to ask her if she had signed the stock and she told him that she had. It is also noted that when witness Ruva talked to the attorney for the estate two weeks prior to the hearing and was told that the signatures on the stock were not the signatures of Janet Skinner, such witness made no mention of the telephone calls. The witness's testimony on the basis of

278

the record before us appears to be contradictory. When witness Ruva was confronted by evidence that the signatures on the certificates were not those of Janet Skinner he then admitted that it would be perjury on his part to say that Janet had signed the certificates. He indicated that in prior stock transactions for Janet Skinner he worked with Joseph Dondanville and that Joseph Dondanville had told him what he wanted done and he followed such directions. Witness Ruva was under bond for guaranteeing such signatures, so that there was an interest on his part in establishing that the signatures were valid and in the outcome of the case. The strongest evidence, therefore, favoring the theory of a gift, the testimony of witness Ruva, contains certain inherent inconsistencies. The net effect of such testimony is that witness Ruva had talked to Janet Skinner on two occasions about the stock transfer indicating she had some knowledge of the transfers.

The stock in the case before us had been in the joint names of Joseph Dondanville and the decedent before the transfer under consideration. There was no showing as to why Joseph had brought the stock back from Florida. Nothing was offered on this subject by the donees nor was there any interrogation by the petitioners in this cause on such issue at the hearing. We note, also, that all persons who presumably were present when the certificates were signed, other than Joseph Dondanville, had died prior to the hearing. The circumstance, also, that Joseph Dondanville had changed his story in that he first testified that his mother and he had signed Janet's name to the certificates, and then admitted that he alone had signed the certificates (following the handwriting expert's testimony) should be considered. There was no clear testimony by the donee, Joseph, or anyone else as to why Janet could not sign her own name to the certificates. There was also no showing as to why Joseph tried to write Janet Skinner's name as Janet

279

Skinner would write it. Joseph also testified that he picked up the certificates in Joliet after the transfer. There was evidence in the record that showed at least some of the certificates were mailed directly to Joseph Dondanville in Florida. This is another inconsistency in the testimony of Joseph Dondanville shown of record.

The fact that Janet Skinner continued to receive the dividends after the gift claimed, raises questions as to whether a gift was intended or disclosed to Janet. While the retention of dividends in itself would not operate to destroy the validity of the gift, the manner in which the transaction was handled raises basic questions. When Joseph Dondanville held the stock jointly with Janet Skinner, he cashed the dividend checks and sent Janet the money. After the alleged gifts, the three donees all sent the money from the dividends back to Joseph and Joseph continued to send the money to Janet, as he had always done when she owned the stock. This raises doubts as to whether Janet really knew or understood that the stock was being transferred beneficially to the Dondanvilles, particularly since this involved substantially all of Janet's assets. It is noted, also, that after Joseph Dondanville sold part of the stock he still paid Janet what the dividends would have totaled. All of this raises questions as to whether Janet really knew about or understood the transfers. These are questions which clear and convincing proof on behalf of the donees should have overcome. The fact that Janet did not file or sign the gift tax return or pay the gift tax indicates either that Janet told the Dondanvilles they were to take care of this or that she didn't know she had made the gift. Clear and convincing evidence should have resolved this question. Such proof was lacking in the cause before us.

█ The net result of a review of the testimony shows that many questions have been left unanswered. Much

of the evidence which was presented could be construed in two ways, pointing first to the fact that there was a gift and pointing, also, to the fact that Janet Skinner had no knowledge that the stock had been transferred. The testimony was consistent with either the pattern of keeping Janet Skinner from learning of the transfer or as supporting the theory of gift. The net result also is that there is very little evidence of the character which is required in a cause of this nature to support the theory of gift in the instant case. As a result, we must conclude that the trial court was in error in determining that the donees discharged the burden of proof imposed on them in this case so as to show there was a valid gift of stock. We must, therefore, conclude that the trial court was in error in finding that a valid gift of the stock had been made to the Dondanvilles.

 As to the bank account issue involved in the present case, the record shows nothing specifically that the funds involved were funds of David Skinner, other than the testimony of the Dondanvilles. The evidence, apart from such testimony, is to the effect that the account contained money which belonged to Janet Skinner. The banker who testified as to the discussions at the time the account was opened stated that he suggested that the word "Agent" be added to the account to keep the money separate from John Dondanville's account. There was testimony that John Dondanville told such banker that it was "Jen's money." In a conversation between John Dondanville and Russell Root at the time of Janet Skinner's funeral, Root testified that John Dondanville had stated that the money was Janet Skinner's money and that he would use it to pay her bills and funeral expenses and then account for the balance to all of the family. John denied such statement. John did, in fact, pay Janet Skinner's bills out of the account but four months after David Skinner died, in February of 1966,

he transferred the balance in the checking and savings accounts to the David Skinner estate. While several of the Dondanvilles testified that this was David's money which he gave to John to put in an account for Janet and Lida, such testimony being testimony of interested parties, should not be given great weight. The circumstance that, two weeks after Janet Skinner's death, John Dondanville withdrew $2,000 from the account and paid said amount to David Skinner to reimburse him for medical bills of Janet Skinner which he had paid, does not seem consistent with the contention that the account was David's money but is more consistent with a conclusion that it was Janet Skinner's money and that David Skinner was entitled to reimbursement for certain advances only. Since there was no evidence other than the Dondanville testimony to show that this account belonged to anyone other than Janet Skinner, clear and convincing evidence was also lacking to establish such issue. The bank account should, therefore, have been held to be part of the Janet Skinner estate. Since the person making the deposit had stated to a third party that the money belonged to Janet Skinner, this constituted an admission at a time of making the deposit which should be binding upon the parties, in view of the record in this cause.

The judgment of the Circuit Court of Will County will, therefore, be reversed and this cause will be remanded to such court with directions to find that respondents have failed to prove a valid gift of the stock in question and, also, to find that the $10,527.89 balance in the account in the Grundy National Bank held in the name of John Dondanville and Joseph Dondanville, Agents, is the property of the estate of Janet Skinner. The Circuit Court is directed to order that respondents in this cause account for or turn over to the Janet Skinner estate the stock which has been asserted as being

gifts to such respondents and, also, to transfer the bank balance herein referred to, to the estate of Janet Skinner.

Reversed and remanded with directions.

STOUDER, P. J. and CULBERTSON, J., concur.